UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Joseph F. AGOSTINO, Defendant–Appellant, Cross–Appellee.

Nos. 97–2105, 97–2340.

United States Court of Appeals, Seventh. Circuit.

Argued Sept. 24, 1997.

Decided Dec. 22, 1997.

Randall Stewart, Office of the United States Attorney, Dyer, IN, Donald J. Schmid (argued), Office of the United States Attorney, South Bend, IN, for Plaintiff-Appellee in No. 97–2105.

Andrew B. Baker, Jr., Office of the United States Attorney, Dyer, IN, Donald J. Schmid (argued), Office of the United States Attorney, South Bend, IN, for Plaintiff-Appellee in No. 97–2340.

Charles A. Asher (argued), South Bend, IN, Peter J. Agostino, Hunt, Suedhoff, Borror & Eilbacher, South Bend, IN, for Defendant-Appellant in No. 97–2105.

Charles A. Asher, Hal R. Culbertson, South Bend, IN, Peter J. Agostino, Hunt, Suedhoff, Borror & Eilbacher, South Bend, IN, for Defendant-Appellee in No. 97–2340.

Before RIPPLE, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

A jury found Joseph F. Agostino guilty of corruptly giving a $4,000 payment to a subordinate in the Toll Road Division of the Indiana Department of Transportation in violation of 18 U.S.C. § 666(a)(2). He challenges his conviction and sentence on several grounds. With respect to his conviction, Agostino argues that the indictment was insufficient, that the prosecution violated his rights to due process by requesting that a key witness not speak to defense counsel, that the evidence was insufficient to convict him, and that the district court erred in failing to provide certain information to the jury during jury instruction. He challenges his sentence by arguing that the district court sentenced him under an incorrect section of the United States Sentencing Guidelines ("U.S.S.G.").

The Government instituted a cross-appeal challenging the sentence imposed by the district court. Specifically, the Government argues that the district court erred in concluding that the defendant must benefit personally from the bribe in order to merit an upward departure under U.S.S.G. § 2C1.1(b)(2)(A). The Government also contends that the district court erred by failing to enhance Agostino's sentence for obstruction of justice under U.S.S.G. § 3C1.1, and by sentencing Agostino to a term below the applicable Guideline range. Because we find merit in only the last of these claims, we affirm Agostino's conviction and remand to the district court to sentence him to a term consistent with the Guidelines.

## I. HISTORY

Joseph Agostino was Administrative Services Manager of the Toll Road Division of the Indiana Department of Transportation ("INDOT") until January 1996. James Goetz, Agostino's subordinate, was the Patron Services Manager. That position required Goetz to act as a liaison between Toll Road management and approximately thirty-four trucking companies and vendors. Among the vendors was Gas City, the fuel supplier to Toll Road gas stations since June 1995.

Under the terms of the contract between INDOT Toll Road Division and Gas City, the fuel prices Gas City charged on the Toll Road were set pursuant to a specific procedure. Part of the procedure required INDOT Toll Road Division to select randomly a list of stations from a predetermined pool;

Gas City would then survey these stations and use a formula to set the fuel prices on the Toll Road. This fuel pricing process was intended to avoid pricing the fuel either too high or too low. The contract permitted periodic changes in the pool of stations as part of an attempt to set a fair price. In addition to setting forth the procedures for fuel pricing, the contract called for the issue of "non-revenue passes"[1] to certain Gas City management personnel.

Initially the random selection of stations and the calculation of fuel prices proceeded in accordance with the contract. Goetz supervised this process and was responsible for the random selection of stations. In June or July 1995, Agostino told Goetz that the process of setting the fuel prices was cumbersome because it required Goetz to select the survey stations and then fax the names of the selected stations to Gas City for the fuel price calculation. Agostino instructed Goetz that he was no longer responsible for randomly selecting the survey stations and that Gas City would take over the selection. Goetz objected to this arrangement because significant effort had gone into constructing the procedure outlined in the contract. According to Goetz, allowing Gas City to select the stations themselves represented a "substantial deviation" from the approved procedure. Despite Goetz's objections, Gas City began to make the survey station selections in July 1995.

At about the same time Agostino informed Goetz that Gas City would receive non-revenue passes for all of its fuel tankers. Goetz was surprised at this development because such passes were expected only after Gas City completed its obligations under the contract, and Gas City had only been operating under the contract for approximately one month.

In mid-July 1995, Goetz and Agostino met in Agostino's office at the Toll Road Division. Agostino handed Goetz an envelope containing $4,000 in cash. Agostino told Goetz he was giving him the money because Goetz had been doing a good job and did not make

enough money. When Goetz asked where the money came from, Agostino replied that it was "PAC money" and from "Lenny," who Goetz understood to be Len McEnery, the General Manager of Gas City.

Goetz took the money to his office and partially counted it. He then tried to return the money to Agostino, but Agostino's office was locked and his secretary was gone for the day. The next morning Goetz returned the money to Agostino. Agostino claimed that if he returned the money it would simply go to the Lieutenant Governor's campaign, but Goetz refused to keep it.

Agostino does not deny that he offered Goetz $4,000 cash in an envelope in July 1995. However, he disputes that this money was for the purpose of influencing or rewarding Goetz. Instead, Agostino claims that the money was tendered to test Goetz's honesty after concerns arose at the Toll Road Division about Goetz's gambling habits and other activities. Agostino asserts that the money was his own, borrowed from a personal home-equity line of credit. Agostino also admits that he did not contact any law enforcement agencies, INDOT legal counsel, or Toll Road management prior to engaging in this "test" of Goetz's honesty.

On October 2, 1996, a federal grand jury returned a one-count indictment against Agostino charging him with Bribery Concerning Programs Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(2). Agostino pleaded not guilty on October 30, 1996. Agostino filed multiple pretrial motions including motions to dismiss for lack of specificity in the indictment, motions to dismiss for lack of jurisdiction, and motions to dismiss for alleged governmental interference with a witness. The district court denied all of Agostino's pretrial motions.

On February 14, 1997, after a five-day trial, a jury found Agostino guilty of a violation of § 666(a)(2). Agostino filed several post-trial motions, reiterating the arguments presented in his pretrial motions and adding a motion for acquittal or new trial based on

1. "Non-revenue passes" are passes that enable the user to travel the Toll Road without paying tolls.

insufficiency of the evidence. The district court denied these motions. At sentencing, the court found that U.S.S.G. § 2C1.2 applied, which set Agostino's base level at 10. The court then imposed a one level upward departure for the value of the bribe, pursuant to U.S.S.G. §§ 2F1.1(b)(1)(B) and 2C1.1(b)(2)(A). The court found that an additional increase for obstruction of justice was not warranted. At the sentencing hearing, the district court orally sentenced Agostino to four months imprisonment, three years supervised release, $7,500 in fines, and a $50 special assessment. In its sentencing memorandum, however, the district court indicated a sentence for Agostino of eight months imprisonment, four months to be served in a prison and the remaining four to be included in the term of supervised release. The remainder of the sentence tracked the sentence imposed at the sentencing hearing: three years supervised release, a $7,500 fine, and a special assessment of $50. The judgment and commitment order issued to the U.S. Marshall describes a third sentence: eight months imprisonment, four months to be served in a prison and the remaining four in community confinement. According to the judgment and commitment order, the three years of supervised release begins after the imprisonment and community confinement. The fines and special assessments remained the same.

## II. ANALYSIS

### A. Sufficiency of the Indictment

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on ... indictment of a Grand Jury." U.S. Const. amend. V. The Sixth Amendment then grants certain rights to persons accused of crimes by the federal government, including the right "to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. The Federal Rules of Criminal Procedure ("Fed.R.Crim.P.") explicate the requirements of an indictment. Fed. R.Crim.P. 7(c)(1) requires that "[t]he indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."

An indictment is constitutionally sufficient and satisfies Fed.R.Crim.P. 7(c)(1) if it states the elements of the crime charged, informs the defendant of the nature of the charge so she may prepare a defense, and enables the defendant to plead the judgment as a bar against future prosecutions for the same offense. *See Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *United States v. Allender*, 62 F.3d 909, 914 (7th Cir.1995), *cert. denied*, 516 U.S. 1076; 116 S.Ct. 781, 133 L.Ed.2d 732 (1996). Indictments need not exhaustively recount the facts surrounding the crime's commission. *See Bates*, 96 F.3d at 970. "Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.1981). We review the sufficiency of an indictment *de novo*. *See United States v. Webster*, 125 F.3d 1024, 1029 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 698, —— L.Ed.2d —— (1997); *United States v. Bates*, 96 F.3d 964, 967 (7th Cir.1996), *aff'd* —— U.S. ——, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997).

The specific portion of 18 U.S.C. § 666 with which Agostino was charged provides:

(a) Whoever ...

. . . .

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent ... of a State ... government, or any agency thereof, in connection with any business, transaction, or series of transactions of such ... government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

The indictment issued by the grand jury on October 2, 1996 tracks the language of the statute. The indictment reads follows:

In or around July 1995, in the Northern District of Indiana, Joseph F. Agostino, defendant herein, did knowingly and corruptly offer and give something of value,

specifically, monies, to [James Goetz] with intent to influence and reward [James Goetz] in connection with the business, transaction, or series of transactions of the Indiana Department of Transportation, Toll Road Division, involving something of value of $5,000 or more.

In violation of Title 18, United States Code, Section 666(a)(2).

Relying on *United States v. Medley*, 913 F.2d 1248 (7th Cir.1990), Agostino first argues that because *quid pro quo* is an "essential element" of a violation of § 666, the indictment is facially insufficient for failing to identify the specific act or acts he was trying to influence by giving Goetz $4,000. In *Medley*, we reviewed jury instructions concerning a violation of § 666(a)(1)(B). The offense in *Medley* was described in the issue instruction "as a prohibition against the giving or receiving of anything of value for the purpose of influencing or being influenced in connection with any business transaction or series of transactions." *Id.* at 1259. The charge failed to note that these actions had to be done "corruptly" as required by § 666(a)(1)(B). *See id.* The court found that in light of the instructions viewed as a whole, "[n]o normal reasonable jury could have misunderstood what the indictment charge was about and what was required to find the defendant guilty." *Id.* at 1261.

The question of whether an indictment must contain specific allegations of a *quid pro quo* was not before the *Medley* court and it did not rule on this issue. The language upon which Agostino wishes to rely appears in the court's discussion of the distinction between a bribe or gratuity, "which are both illegal under different parts of the statute," *id.* at 1260, and the payment of a legitimate fee. The court stated, "[t]he essential element of a section 666 violation is 'quid pro quo'; that is, whether the payment was accepted to influence and reward an official for an improper act." *Id.* at 1260. It is clear from the context that the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666. The elements of the offense remain those that are set forth in the statutory language.

Additionally, it is important to note that *Medley* involved a violation of 666(a)(1)(B), which criminalizes the *receipt* of a bribe. The charge against Agostino involves § 666(a)(2), and focuses on the *offer* of a bribe. Therefore, *Medley* is not controlling. We decline to import an additional, specific *quid pro quo* requirement into the elements of § 666(a)(2). Section 666(a)(2), by its statutory language, requires that the defendant act "*corruptly ... with intent to influence or reward.*" This intent, and not any specific *quid pro quo* is what must be alleged in the indictment.[2] Thus, Agostino's indictment is not facially insufficient for failing to include an essential element of the offense.

▉ Agostino's second argument is that the indictment did not sufficiently enable him to prepare a defense. *See Hamling*, 418 U.S. at 117, 94 S.Ct. at 2907–08. The crux of Agostino's complaint is that, at the time of the indictment, the Government did not reveal its theory of intent—i.e. the Government

---

2. In denying Agostino's motions to dismiss the indictment for lack of specificity, the district court referred to a recent case from the Eleventh Circuit. In *United States v. Castro*, 89 F.3d 1443 (11th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997), the Eleventh Circuit addressed whether, under § 666(a)(2), the Government must show a direct *quid pro quo* relationship between the defendant and the agent of the agency receiving federal funds. In *Castro*, the person receiving the bribes was a middleman, who then exerted influence over an agent of the organization receiving federal funds. On the facts of that case, the charge would fail if § 666(a)(2) required a *direct quid pro quo* between the defendant and the agent of the organization receiving federal funds. The Eleventh

Circuit declined to import a "directness" requirement into § 666(a)(2), stating that "the appellants' narrow reading of the bribery statute would belie the statute's purpose 'to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery.'" *Id.* at 1454 (quoting S.Rep. No. 225, 98th Cong., 2d Sess. 369–70 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510–11). While it is useful to note the Eleventh Circuit's rejection of a direct *quid pro quo* requirement, our case involves whether § 666(a)(2) requires a statement in the indictment which sets forth the *quid pro quo* action taken by the recipient of the alleged bribe, regardless of whether the *quid pro quo* relationship was a direct one or not.

did not set forth the specific reason why Agostino offered something of value to Goetz. Agostino asserts that he was unable to prepare a defense without a specific reference to the "business, transaction, or series of transactions of the Indiana Department of Transportation, Toll Road Division, involving something of value of $5,000 or more" involved.

■ This argument is unpersuasive. "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Allender,* 62 F.3d at 914. The indictment clearly sets forth the relevant time, person, agency and currency involved in the criminal transaction. This information is sufficient to put Agostino on notice of the conduct for which he was charged. Armed with this knowledge, he had ample opportunity to develop a defense to that charge. Put simply, neither the Constitution nor Fed.R.Crim.P. 7(c)(1) requires the indictment to include the information Agostino seeks. *See United States v. Roya,* 574 F.2d 386 (7th Cir.1978) (noting that indictment which sets forth elements of offense, time and place of defendant's conduct that constitutes offense, and citation to statute violated satisfies necessary requirements). "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall,* 665 F.2d 126, 135 (7th Cir.1981).

This is particularly true in cases where the information requested is peculiarly within the defendant's own knowledge. Agostino would have liked the Government, at the grand jury stage, to have revealed more specific information about how it planned to prove the intent element. Specifically, Agostino wanted to know what business or transaction the Government would allege he was trying to influence. If this information was memorialized in the indictment, the Government would be tied to that argument. No one knows why Agostino gave Goetz $4,000 better than Agostino does. To require the Government to articulate and be bound to a particular theory at this early stage in the proceedings is neither constitutionally nor statutorily re-

quired, and we decline to craft a judicial rule imposing such a requirement.

## B. Governmental Interference with a Witness

■ Agostino next argues that his rights to due process were violated by governmental interference with a key witness. Agostino asserts that Assistant United States Attorney ("AUSA") Donald Schmid requested that Goetz refrain from speaking with defense counsel about the case. The Government counters that it never instructed Goetz not to speak with defense counsel but instead simply informed Goetz of his right to decline interviews with the defense.

■ "[T]he inability of a defendant to interview witnesses is a constitutional problem only if the state artificially restricted the defendant's ability to obtain evidence." *United States v. DeRobertis,* 766 F.2d 270, 274 (7th Cir.1985). Since a witness is free to decide whether to grant an interview with defense counsel, *see United States v. Bowens,* 318 F.2d 828, 829 (7th Cir.1963); *see also United States v. Pinto,* 755 F.2d 150, 152 (10th Cir.1985); *United States v. Fischel,* 686 F.2d 1082, 1092 (5th Cir.1982), reversal on the ground of governmental interference with a witness "requires a clear showing that the government instructed the witness not to cooperate with the defendant." *United States v. White,* 454 F.2d 435, 439 (7th Cir. 1971).

As identified by the district court, the "threshold question" is whether Agostino has "clearly shown" the Government instructed Goetz not to discuss the case with defense counsel. In support of its claim, Agostino cites to a letter dated November 26, 1996 from Goetz's counsel, David P. Jones, to defense counsel. The letter states, in pertinent part: "After Mr. Goetz's Grand Jury testimony, U.S. Attorney Schmid asked Mr. Goetz, as a courtesy, not to discuss his testimony. Attorney Schmid made it clear that he had no authority to command Mr. Goetz not to talk nor could he prevent Mr. Goetz from speaking about what happened." Jones also testified during a hearing on the issue in a manner that echoed the statements in his letter of November 26, 1996. Defense coun-

sel argues that the letter and attorney Jones's testimony, coupled with the fact that Goetz refused to participate in interviews with defense counsel, establish that AUSA Schmid "instructed" Goetz not to speak with defense counsel in contravention of applicable case law.

The Government responds with a letter of its own, written the day after the letter proffered by Agostino. On November 27, 1996, the following statement was transmitted to Goetz from AUSA Schmid:

> You told me that you had indicated to your lawyer that you did not wish to meet with [defense counsel]. Let me reiterate what I told you. I told you that it was up to you whether you choose to meet with … any of Mr. Agostino's defense lawyers. While you are free to meet with them, I told you that you had no obligation to meet with them. The choice is entirely yours.

■ Even were we to credit Agostino's version of events, however, he has not "clearly shown" that the Government violated his rights to due process. The characterization of Schmid's actions in the November 26 Jones letter suggests that, in the worst light, Schmid *requested* that Goetz not speak to *anyone* about his testimony. Governmental interference occurs when the Government *instructs* the witness not to speak, *see White*, 454 F.2d at 439, or *artificially restricts* defense counsel access to the witness. *See DeRobertis*, 766 F.2d at 274. The one line characterization of Schmid's actions in Jones's letter is a far cry from the "clear showing that the government instructed the witness not to cooperate with the defendant," *White*, 454 F.2d at 439, that is required for reversal on the grounds of governmental interference. Agostino has failed to make the requisite showing to establish a violation of his rights to due process.

## C. Sufficiency of the Evidence

■ Agostino also attacks the weight of the evidence presented at trial. First, he argues that the evidence was insufficient to prove that he acted corruptly or with the intent to influence or reward Goetz. Second, he asserts that the evidence failed to establish the jurisdictional prerequisite to § 666.

Agostino bears a "heavy burden" in pursuing these sufficiency of the evidence claims. *See United States v. Briscoe*, 65 F.3d 576, 586 (7th Cir.1995). The question in reviewing these claims is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). An appellate court will overturn the verdict only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. *See United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.), *cert. denied* — U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996); *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir.1994).

### 1. Sufficiency of the Evidence with Respect to Intent Element

■ It is undisputed that Agostino offered Goetz $4,000 in cash in July 1995. The issue centers around his intent in offering the cash payment. While the Government asserts that the payment was made in an attempt to influence or reward Goetz, the defense argues that Agostino was simply engaging in a test of Goetz's honesty. If there is any evidence from which a reasonable jury could have found that Agostino was attempting to influence or reward Goetz, then the verdict must stand. *See Hickok*, 77 F.3d at 1002.

The Government presented sufficient circumstantial evidence for a reasonable jury to conclude that Agostino corruptly offered the money to Goetz in an attempt to influence or reward him in connection with Toll Road business. The Government established that the money was passed at approximately the same time as Agostino, in violation of the contract, turned over to Gas City the responsibility for selecting the survey stations for fuel pricing on the Toll Road. Agostino also offered the money to Goetz shortly after he informed Goetz that Gas City would receive non-revenue passes for all of its fuel tankers. While not in violation of the contract, Gas City received these passes much earlier than

Goetz had expected they would. The Government presented evidence that established that Goetz had objected and expressed surprise at these developments, and shortly thereafter, Agostino offered him $4,000 in cash for "doing a good job." A reasonable jury could have found that this timing provided circumstantial evidence that Agostino offered Goetz the money with the requisite corrupt intent to establish a violation of § 666(a)(2).

The jury also has the choice to disbelieve the defendant's testimony regarding his intent. Agostino testified that he used his own money to test Goetz's honesty, did not discuss this test with anyone else, and performed this test without any consultation with the appropriate INDOT or Toll Road personnel. Yet Agostino gave Goetz a glowing annual review at approximately the same time he claimed to be having doubts about Goetz's trustworthiness. Agostino also did not document his suspicions until December 1995, nearly six months after the incident, but only two days after INDOT Toll Road Division was subpoenaed for documents involving the $4,000 payment and the benefits passed to Gas City around the time of the payment. A reasonable jury could have found, on the basis on this evidence, that Agostino's explanation was not credible and that the money was to influence or reward Goetz in connection with the Gas City transactions.

### 2. Sufficiency of the Evidence with Respect to the Federal Funding Element

Agostino also challenges the sufficiency of the evidence regarding the $10,000 funding element. Section 666 requires that the person bribed be an "agent" of an organization, government, or agency that receives in excess of $10,000 from the federal government within a one year period. See 18 U.S.C. § 666(a)(2), (b). Under the statute, an "agent" is "a person authorized to act on behalf of another person ... and ... includes a servant or employee, and a partner, director, officer, manager, and representative." Id. § 666(d)(1). If the Government produced any evidence from which a reasonable jury could conclude that Goetz was an agent of an organization that received the requisite federal funding, we will not disturb the verdict. See Hickok, 77 F.3d at 1002; Crowder, 36 F.3d at 695.

It is undisputed that INDOT receives more than $10,000 from the federal government in any one year period. Agostino argues, however, that Goetz was an agent solely of INDOT Toll Road Division and not an agent of INDOT. We reject this contention. The evidence presented to the jury was sufficient for a reasonable jury to conclude that as an agent of INDOT Toll Road Division, Goetz was also an agent of INDOT.

First, the Government produced evidence that the Toll Road Division is simply a subpart of INDOT, not an independent organization. Government Exhibit 14 is an organizational chart that clearly identifies the Toll Road Division as a subdivision of INDOT. Both the Commissioner of INDOT and the Interim Toll Road Division Manager testified that the Toll Road Division was a subdivision of INDOT. Additionally, Toll Road Division employees are counted as part of the INDOT workforce when INDOT establishes how many people it employs.

Second, the Government presented evidence that established INDOT exercises management authority over the Toll Road Division. The INDOT Commissioner conducts meetings with heads of the divisions within INDOT, including the Toll Road Division, every four to six weeks. There was also evidence to suggest that INDOT exercises control over Toll Road personnel decisions. In regard to the Gas City contract at issue in this case, the INDOT Commissioner testified that he was personally involved in the bid preparation for the fuel supplier on the Toll Road as were INDOT's legal staff, Chief Financial Officer, Chief Engineer, and Public Relations Officer. The Gas City contract, under which Goetz was responsible for selecting survey stations, is signed by the INDOT Commissioner. Additionally, several witnesses testified that the INDOT Commissioner gave directions, orders and advice regarding the implementation of the Gas City contract.

Third, the Toll Road Division receives support from other INDOT divisions. INDOT's Internal Affairs Division deals with problems at the Toll Road. The Toll Road Division goes to INDOT for labor management and labor relations advice and receives support from INDOT's Public Affairs and Procurement Divisions.

In sum, the Government produced sufficient evidence to establish that Goetz, as an employee of the Toll Road Division, was also an employee of INDOT and therefore an agent of INDOT under the statutory definition. *Accord United States v. Moeller*, 987 F.2d 1134 (5th Cir.1993) (finding that employees of Texas Federal Inspection Service (TFIS) were agents of Texas Department of Agriculture (TDA) because TDA supervised TFIS, and TFIS performed discretionary functions for TDA and enforced regulations promulgated by TDA).

### D. Challenge to Jury Instructions

■■■■ Agostino next challenges the court's instructions to the jury regarding the federal funds element, arguing that the district court erred by not providing the jury with the text of allegedly relevant Indiana statutes set forth in defendant's tendered instruction number four. The defense contends that the statutes were necessary to enable the jury to determine whether Goetz was an agent of an agency that received the requisite federal funding. We review jury instructions as a whole, asking whether they were "sufficient to inform the jury correctly of the applicable law." *Wilson v. Williams*, 83 F.3d 870, 874 (7th Cir.1996); *see also Maltby v. Winston*, 36 F.3d 548, 560 (7th Cir.1994). "In this review we avoid fastidiousness and inquire only whether the correct message was conveyed to the jury reasonably well." *Wilson*, 83 F.3d at 874; *see also United States v. Perez*, 43 F.3d 1131, 1137 (7th Cir.1994). We will reverse only if, "'considering all the instructions, the evidence and the arguments,' it appears that 'the jury was misled ... [and its] understanding of the issues was seriously affected

to the prejudice of the complaining party.'" *Roggow v. Mineral Processing Corp.*, 894 F.2d 246, 248 (7th Cir.1990) (alteration in original) (quoting *Simmons v. Pinkerton's, Inc.*, 762 F.2d 591, 597 (7th Cir.1985)); *see also United States v. Hall*, 109 F.3d 1227, 1237 (7th Cir.), *cert. denied* —— U.S. ——, 118 S.Ct. 153, —— L.Ed.2d —— (1997); *Perez*, 43 F.3d at 1137.

The district court instructed the jury as follows:

> In order to establish the offense of bribery, the government must prove the following elements beyond a reasonable doubt:
>
> First, that the defendant offered, gave, or agreed to give anything of value to another person;
>
> Second, that the defendant did so corruptly with intent to influence or reward an agent of a state agency in connection with any business, transaction or series of transactions of that agency involving a thing of value of $5,000 or more; and
>
> Third, that the state agency involved must have received, in a one-year period, in excess of $10,000 in federal funds or benefits.
>
> . . . .
>
> It is not required that each division or subpart of a state agency receive any federal funds or benefits. All that is required is that the state agency have received at least $10,000 in federal funds or benefits in any one-year period.

This last paragraph is an accurate statement of law *if* the agent in question is an agent of the state agency itself and not just an agent of a division or subpart of that agency. *See Moeller*, 987 F.2d at 1137 ("[S]o long as the agency received $10,000 per year from a federal assistance program, its agents are subject to section 666.") The uncontroverted evidence in this case established that Goetz was an employee of INDOT, and therefore under the statutory definition, he was an agent of INDOT.[3] The jury instruction

---

3. While the defense submitted evidence that the Toll Road Division was operated as a separate entity from INDOT in accordance with Indiana state statutes, the defense did not present evidence controverting that INDOT had management authority over the Toll Road Division, that Goetz implemented the Gas City contract which was signed by the Commissioner of INDOT, or

therefore was "sufficient to inform the jury correctly of the applicable law." *Wilson*, 83 F.3d at 874. Agostino's challenge to the jury instruction is therefore denied.

### E. Application of U.S.S.G. § 2C1.1 to Calculate Agostino's Base Level

 Agostino's final argument on appeal is that the district court erred in sentencing him under U.S.S.G. § 2C1.1 instead of U.S.S.G. § 2C1.2. Appendix A to the Sentencing Guidelines directs that either U.S.S.G. § 2C1.1 or § 2C1.2 is applicable to convictions under 18 U.S.C. § 666(a)(2). "When the statutory index lists more than one potentially applicable guideline, the district court is charged with choosing from among the guidelines specified the one that is most appropriate based on the nature of the offense conduct." *United States v. Moeller*, 80 F.3d 1053, 1061 (5th Cir.1996) [hereinafter *Moeller II* ].

 The commentaries to the relevant sections explain that "[Section 2C1.1] applies to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence his official actions," U.S.S.G. § 2C1.1, comment. (backg'd), while "[Section 2C1.2] applies to the offering, giving, soliciting, or receiving of a gratuity to a public official in respect to an official act. A corrupt purpose is not an element of this offense." U.S.S.G. § 2C1.2, comment. (backg'd). In choosing between these two guidelines, the issue before the district court was essentially whether Agostino's actions were more akin to providing a gratuity than to passing a bribe. U.S.S.G. § 2C1.2 would apply to the former case while U.S.S.G. § 2C1.1 would apply to the latter. As this is a factual determination, we review for clear error. *See United States v. Emerson*, 128 F.3d 557, 561–62 (7th Cir. 1997); *United States v. Yoon*, 128 F.3d 515, 528–29 (7th Cir.1997).

 The distinction between a bribe and a gratuity is sometimes difficult to discern. This difficulty arises because the distinction, in many cases, will turn on the intent of the payer. If the payer's intent is to influence or affect future actions, then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity. *See United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir.1993). In the present case, Goetz was unable to say with certainty what Agostino's intent was. Goetz testified that he did not know what he was supposed to do for the money offered to him by Agostino. Goetz himself did not know if he was being rewarded for something he did in the past or if he was being bribed to do something in the future. The Government hypothesized that he may have been bribed *not* to do something in the future—specifically, to not cause any trouble with regard to the benefits being passed to Gas City.

Given the somewhat confused state of evidence regarding Agostino's intent, we cannot conclude that the district court committed clear error in sentencing Agostino under U.S.S.G. § 2C1.1. The district court was privy to the testimony and argument regarding Agostino's intent first hand, and it is therefore more appropriate for it to determine whether the money was offered with a corrupt purpose. *See Moeller II*, 80 F.3d at 1062 ("We decline to substitute our own more detached assessment of the extensive evidence presented by both parties for the judgment of the district court. . . ."). In addition, the jury must have believed that Agostino acted corruptly because the statute under which Agostino was convicted requires a corrupt purpose. *See* 18 U.S.C. § 666(a)(2) (requiring that defendant "*corruptly* gives, offers, or agrees to give anything of value") (emphasis added). Considering this requirement for conviction under the statute as well as the district court's privileged position with regard to the testimony and arguments, the district court's application of U.S.S.G. § 2C1.1 was not clearly erroneous. *Accord Mariano*, 983 F.2d at 1159 (holding that district court did not commit clear error in sentencing defendants under U.S.S.G.

contradicting any of the other evidence from which a reasonable jury could have concluded that Goetz was an agent of INDOT.

§ 2C1.1 because defendants sought to receive *quid pro quo* and "since the offenses to which they pleaded guilty [violations of 18 U.S.C. § 666(a)(2) ] involved corrupt intent").

### F. Government's Cross–Appeal

We review a sentencing court's factual determinations for clear error and its application of the Sentencing Guidelines *de novo*. *See Emerson,* 128 F.3d 557, 561–62; *Yoon,* 128 F.3d 515, 528–29.

### 1. Upward Departure for Benefit of Bribe

 Sentencing Guideline § 2C1.1(b)(2)(A) provides:

> If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase [the base offense level] by the corresponding number of levels from the table in § 2F1.1 (Fraud and Deceit).

U.S.S.G. § 2C1.1(b)(2)(A). The district court, finding that "the defendant did not receive any benefit, nor did he intend to receive a benefit," used the value of the payment, $4,000, to impose a one-level increase in the base offense level. The Government makes two closely-related arguments. First, the Government suggests that the district court should have considered the benefit to Gas City. Second, the Government argues that the district court made an error of law in holding that the defendant must have personally received the benefit in order to merit an upward departure.

The Government first argues that the benefit that accrued to Gas City should be considered in the calculation of benefit. Agostino counters that the Sentencing Guidelines did not contemplate benefits accruing to third parties in factual situations like the present case. Agostino cites to the background section of U.S.S.G. § 2C1.1, which he

claims is "very telling" as to what the Guideline Commission had in mind. In discussing whether the value of the bribe itself should be deducted from the benefit received, the background section states, "for deterrence purposes, the punishment should be commensurate with the gain to the *payer* or the *recipient* of the bribe, whichever is higher." U.S.S.G. § 2C1.1, comment. (backg'd) (emphasis added). Accordingly, the defense asserts that for the purpose of the enhancement, the court can only look to the benefits to the payer or the recipient. Since Gas City is neither a payer nor a recipient, the defense argues, the court cannot consider any benefits accruing to it.

There is some precedent suggesting that the sentencing court may consider benefits flowing to third parties in determining benefit/loss under U.S.S.G. § 2C1.1. *See United States v. Pretty,* 98 F.3d 1213 (10th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 2436, 138 L.Ed.2d 197 (1997); *see also United States v. Muldoon,* 931 F.2d 282 (4th Cir. 1991) (by implication).[4] However, these cases are factually distinguishable from the present case. In *Pretty,* the defendants, Pretty and Whitehead, were charged with engaging in a bribery scheme in violation of 18 U.S.C. § 666, as well as conspiring to engage in this scheme in violation of 18 U.S.C. § 371. *See id.* at 1216. The jury convicted the defendants on all charges in the indictment. *See id.* at 1217. One of the conspirators, Kuhse, was not before the court in the case. In determining the appropriate base level, the sentencing court considered the benefit to Kuhse, a conspirator. *See id.* at 1222. The court found that the relevant question was "whether the amount received by Kuhse was reasonably foreseeable to the defendants," citing U.S.S.G. § 1B1.3(a)(1)(B). *See id.*

Sentencing Guideline § 1B1.3(a)(1)(B) states that specific offense characteristics

---

**4.** The other cases cited by the Government in its brief are inapplicable to the present case. One of the cases allows for enhancement for benefit to the payer, even if the defendant is someone other than the payer himself. *See United States v. Hang,* 75 F.3d 1275 (8th Cir.1996) (defendant was payee). Since in the present case the defen-

dant was the payer, and no benefit to him was shown, this case is not helpful. The other case cited by the Government is similarly unhelpful. *See United States v. Falcioni,* 45 F.3d 24 (2d Cir.1995) (decided based on loss to government; court does not reach issue of benefit).

shall be determined on the basis of the following:

. . . .

in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

This section clearly requires "a jointly undertaken criminal activity," although it matters not whether such activity is formally charged as a conspiracy. This requirement makes the section inapplicable to Agostino. Unlike *Pretty*, in the case before us the Government did not provide evidence that Agostino was part of a "jointly undertaken criminal activity." The only evidence to suggest such an endeavor is Goetz's testimony that Agostino told him the $4,000 was from Len McEnery, Gas City's General Manager. Agostino contradicted this testimony in asserting that the money was his private money from a home equity line-of-credit. There is no additional evidence on the question of whether Agostino was involved in a jointly undertaken criminal activity, therefore this section and the precedent applying it is irrelevant.[5]

Other circuits have allowed sentencing courts to consider benefits flowing to organizations where the defendant is shown to be an agent of such organization. *See United States v. Dijan*, 37 F.3d 398 (8th Cir.1994) (defendant was payer; court used benefit to payer-owned corporation, in whose interest payer acted); *United States v. Jackson*, 876 F.Supp. 1208 (D.Kan.1994) (payer-defendants were high-level employees of hospital; court

found government failed to meet burden in proving benefit to hospital), *aff'd sub nom. United States v. Martinez*, 76 F.3d 1145 (10th Cir.1996). In the instant case, the Government asks the court to enhance the defendant-payer's base level based on benefits to an *unrelated* third party. If the Government had shown that Agostino acted as Gas City's agent in this transaction, these cases may be relevant. However, as above, the only evidence on that count is Goetz's testimony that when prodded, Agostino told him the $4,000 was from Len McEnery of Gas City. Agostino contradicts this claim by asserting that the money was his own that he kept in his home. Thus, this theory fails as well. In sum, the precedent establishes that benefits to third parties may be considered in certain factual circumstances, but the Government did not establish the necessary circumstances in this case.

■ The flip-side of the Government's argument that the benefits to Gas City should have been considered is its argument that the district court erred as a matter of law in holding that the defendant must have personally benefitted in order to merit an enhancement. It is true that some of our cases establish the proposition that the defendant need not receive the benefit in order to have his sentence enhanced. *See United States v. Muhammad*, 120 F.3d 688 (7th Cir.1997) (holding that benefit to payer may be considered in enhancing sentence of defendant-payee). The Government's contention that the district court erred as a matter of law is unpersuasive, however, as it is based on an erroneous interpretation of the reach of the conclusion embodied in the district court's sentencing memorandum. Although the district court did not explicitly analyze the third party question, its statement of the law as it relates to the facts of this case was correct. In the present case, where there is no established link between the defendant and the

---

5. While the court in *Muldoon* did not explicitly reference this section, the facts of the case are similar to *Pretty*. In *Muldoon*, the defendant acted as a middleman, passing bribes from one corporation to a government agent. *See* 931 F.2d at 284–85. The defendant was charged and convicted of the substantive offense, as well as conspiracy to commit the substantive offense. *See id.* at 284. The evidence clearly established

that the defendant was acting on behalf of the corporation in passing the bribes. *See id.* at 288. Therefore the case is distinguishable and inapplicable for the same reasons stated above. Additionally, the court in *Muldoon* used the value of the bribe, not the value of the benefit received, because it found that the evidence did not disclose the value of the benefit. *See id.* at 289.

third party that received the benefit, the appropriate measure of the benefit is the amount of personal benefit to the defendant. Because the Government did not establish that Agostino received a benefit, the district court correctly declined to use any benefit as the measure for enhancement under U.S.S.G. § 2C1.1(b)(2)(A). We therefore find that under the unique facts of this case, the district court did not err in using the value of the bribe, and not the value of the benefit to Gas City, to determine the upward enhancement under U.S.S.G. § 2C1.1(b)(2)(A).

2. Enhancement for Obstruction of Justice

■■■■■ The Government argues that the district court erred in failing to impose a two-level increase in Agostino's sentence under the obstruction of justice guideline, U.S.S.G. § 3C1.1.[6] Sentencing Guideline § 3C1.1 states that a sentencing court shall increase the defendant's base offense level by two if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Perjury can be the basis for such an enhancement. See U.S.S.G. § 3C1.1, comment. (n.3(b)). A defendant commits perjury for the purpose of this provision if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993).

■■■■■ The district court's determination regarding whether the defendant willfully committed perjury, and therefore deserves the sentence enhancement, is a factual finding we review for clear error. See Emerson, 128 F.3d 557, 561–62 · Yoon, 128 F.3d 515, 528–29. "Special deference is given to findings based upon credibility determinations, which 'can virtually never be clear error.'" Hickok, 77 F.3d at 1007 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)). At the outset we note that the district court is

"in the best position to evaluate [Agostino's] truthfulness," United States v. Easley, 977 F.2d 283, 286 (7th Cir.1992), and we are reluctant to overturn the district court's finding on this issue.

Although Agostino did not testify at trial, portions of his grand jury testimony were read into the record. While there are statements within the proffered grand jury testimony that were contradicted by other witnesses and circumstantial evidence, the district court determined that "there are no facts in the record that prove the defendant committed perjury." Specifically, the district court found that there was "no proof of the requisite 'willfulness.'"

■■■■ The Government asserts that Agostino lied by testifying to the following things: (1) that he did not state to Goetz that the $4,000 was PAC money or from "Lenny," (2) that it was Goetz's idea to give nonrevenue passes to Gas City, (3) that the day after giving Goetz the $4,000, he told Goetz that the $4,000 was his (Agostino's) personal money, and finally (4) that the money was given as a test of Goetz's honesty. With respect to issues (1) through (3), the testimony breaks down to a "he said/he said" credibility battle. Agostino testified as outlined above, while Goetz testified to the opposite. The mere fact that Agostino's testimony before the grand jury conflicted with the testimony of other witnesses at trial does not require a finding of obstruction of justice, however. The obstruction of justice enhancement requires a finding of willfulness, and, as the Supreme Court noted in Dunnigan, "an accused may give inaccurate testimony due to confusion, mistake, or faulty memory" Dunnigan, 507 U.S. at 95, 113 S.Ct. at 1117. Thus not all inaccurate testimony necessarily reflects a willful attempt to obstruct justice. Because the district court has the best perspective to judge issues of credibility, the district court's refusal to find Agostino's testimony perjurious is not clearly erroneous.

Additionally, while the question of intent (issue (4)) was central to the trial, Agostino's

---

6. While at sentencing the Government offered several reasons for an obstruction of justice enhancement, in its appeal the Government focuses on the claim of perjury. We therefore devote our discussion to the perjury issue.

testimony with regard to his intent in giving Goetz the $4,000 is not so clearly perjurious that we will overturn the district court's determination. Agostino testified before the grand jury that

> [M]y intent was that, when I presented him with the envelope, that he would come forward, either, one, feel guilty and automatically tell me if he was up to anything, or two, that when he suggested various companies, et cetera, narrow down the possible field, give me something further that I could look into basically at that point to go forward.

It is at least possible that Agostino did have this intent when he passed the money to Goetz *in addition to* a corrupt intent to influence or reward Goetz. The circumstantial evidence tending to show corrupt purpose, combined with the jury's verdict, which required a finding a corrupt purpose, do not conclusively establish that Agostino committed perjury. *See Dunnigan,* 507 U.S. at 94, 113 S.Ct. at 1117 ("[N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury."); *United States v. Buchannan,* 115 F.3d 445, 451 (7th Cir.1997) (finding that "[t]o the extent that [prior] cases affirmed sentencing enhancements merely on the basis of a verdict that was inconsistent with the defendant's testimony, they are no longer authoritative after *Dunnigan*"). While we recognize this scenario is unlikely, and admit that the facts of this case present a close call, we cannot say that we have " 'the definite and firm conviction that a mistake has been committed.' " *United States v. Hassan,* 927 F.2d 303, 309 (7th Cir.1991) (quoting *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511). Therefore, we cannot conclude that the district court committed clear error in refusing to enhance Agostino's sentence for obstruction of justice.

### 3. Discrepancy Between the Oral Sentence Pronounced and that Directed by the Sentencing Memorandum

■ At sentencing, the district court set Agostino's offense level at eleven, which placed him in Zone C of the sentencing table. The sentencing range for a total offense level of eleven and a Criminal History Category I is from eight to fourteen months. Under U.S.S.G. § 5C1.1(d)(2)

> If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by—
>
> . . .
>
> a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

The district court then orally announced the following sentence in the defendant's presence: "four months imprisonment in a jail located in Indiana or Illinois, to be designated by the United States Marshall or by the United States Bureau of Prisons ... This confinement is to be followed by three years of supervised release and the standard conditions are to apply." A fine and a special assessment was also imposed.

As noted by AUSA Schmid at the sentencing hearing, the orally announced sentence does not conform to the Guidelines because it imposes only four months confinement rather than the eight month minimum required by the Guidelines. While the sentence imposes three years of supervised release, it does not contain the necessary "condition that substitutes community confinement or home detention according to the schedule in subsection (e)" for the remaining four months of the minimum sentence. U.S.S.G. § 5C1.1(d)(2).

The sentencing memorandum does bring the sentence within the appropriate sentencing range:

> This court hereby sentences this defendant to eight (8) months, four (4) months of which will be served, in a jail located in Illinois or Indiana to be designated by the United States Marshall or the United States Bureau of Prisons. The remaining four (4) months will be included in the term of supervised release pursuant to § 5C1.1(d)(2).... The confinement is to be followed by three (3) years supervised release.

It still does not specify, however, whether the "remaining four (4) months" are to be spent in community confinement or home detention. Additionally, this description seems to include the remaining four months within the three years of supervised release.

Finally, in the judgment and commitment order issued to the U.S. Marshall, the sentence imposed is described as follows:

> The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Eight (8) months imprisonment, 4 months served in a prison and the remaining 4 months in community confinement.... Upon release from imprisonment and community confinement, the defendant shall be on supervised release for a term of Three (3) years.

This version of the sentence clarifies that the remaining four months will be spent in community confinement but seems to state that the three years of supervised release begin *after* the four months of community confinement (as opposed to the sentencing memorandum, which indicated that the four months of community confinement would "be included in the term of supervised release").

When a discrepancy exists between an oral and written sentence, the oral sentence controls. *See United States v. Daddino*, 5 F.3d 262, 266 & n. 5 (7th Cir.1993) (collecting cases); *United States v. Makres*, 851 F.2d 1016, 1019 (7th Cir.1988). This result is demanded by Fed.R.Crim.P. 43(a), which has as its source the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments. *See United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); *see also* Fed.R.Crim.P. 43(a) ("The defendant shall be present ... at the imposition of sentence...."). In this case the oral sentence imposed is contrary to the Sentencing Guidelines because it provides only for four months of confinement—four months less than the minimum eight months dictated by the applicable Guideline range. From the sentencing memorandum and judgment and

commitment order it appears that the district court's intent was to impose the minimum eight months of confinement—but something got lost in the translation. Because the district court departed below the applicable guideline range in its orally pronounced sentence we are required to remand the case for resentencing.[7] Because we remand for resentencing, we need not address the questions presented by the discrepancy between written sentences, but we are confident consistency will be achieved on remand.

### G. Conclusion

We reject Agostino's appeals, and therefore his conviction is AFFIRMED. With regard to the sentencing issues, we find that the district court did not err in the application of the Sentencing Guidelines or in the determination regarding enhancements. However, because the orally announced sentence was below the minimum set by the Sentencing Guidelines, we REMAND for resentencing consistent with this opinion.

---

7. Because the defendant has a constitutional right to be present for sentencing, we cannot allow the sentencing memorandum or judgment papers to control. Were we to allow such a result, the defendant would effectively be sentenced in absentia.